Case number 24-1221, NL. NP Red Rock LLC doing business as Red Rock Casino Resort Spa Petitioner v. National Labor Relations Board. Mr. Lominak for Petitioner NP Red Rock LLC, Ms. Weber for Petitioner Local Joint Executive Board of Las Vegas, Mr. Weitz for the respondents, Ms. Weber for the intervener. All right, counsel, we may proceed. May it please the court, Rayburn Lominak for the petitioner, Red Rock. The NLRB's case against Red Rock is grounded in sensationalism rather than the law. Red Rock's parent company, Station Casinos, decided to improve benefits for nearly 14,000 employees across all of its properties in Las Vegas, including at properties that were already unionized. That decision was made before the Workers' Union filed a petition to represent Red Rock workers. This was not, as the board described it, a carefully crafted corporate strategy intentionally designed at every step to interfere with employees' free choice whether to select a union or not. It was carefully crafted to improve lives. Free choice is an inviolate right under the NLRA, as this court has observed. Employees are guaranteed the freedom to choose whether their own best interests are protected by or served by a union or not. A majority of Red Rock's 1,300 employees decided through a secret ballot election in December 2019 that their best interests were better served without a union. But although you approved the 2020 plan before the union filed the petition, I said although you approved the 2020 plan before the union filed the petition, there's certain direct evidence in the record, you know, quoting things like incentivized team members not to vote for a union, offering free HMO would take away from the union power. How do we ignore those particular statements of direct evidence that perhaps you were trying to take that idea? Yeah, so that is direct evidence, but it's direct evidence of an intention to not want to be unionized, which is not unlawful. The board mischaracterizes, overgeneralizes, and overstates language that was cherry-picked from thousands and thousands of documents to suggest that Red Rock and its executives were trying to kill or destroy the employees' rights. They were not, and there's not a single bit of evidence that they were. That is drawn from the board's inferences based on that, but those. But our standard of review is deferential to the board. It just, their findings just has to be supported by substantial evidence, and why isn't the evidence cited by Judge Childs sufficient? So the evidence that's cited by Judge Childs goes directly to the motive behind the decision to grant these benefits, but it doesn't go to the motive to interfere with employees' rights, which is a very different thing, and this court has recognized in the Skyline Court case, which we've cited throughout our briefs, that a grant of benefits is not a serious violation. But what's the timing of this? The timing was intended to undermine the union organizing efforts. The timing of the announcement came after the petition, but the timing of the benefits themselves, the grant of benefits, which the board in its decision says was the heart of the case, that was well before. The announcement alone did come after the petition was filed, and the board inferred that it was intended to influence the election. But the problem with the board's case on the bargaining order issue is no bargaining order has ever issued for an unlawful announcement, the speeding up of an announcement of a benefit. The employees were going to get this benefit. It had been granted. There was no reason to delay telling the employees what they were going to get. Now, yes, the board did find the announcement unlawful, but again, that's not the heart of their gistle, and they know it. The heart of their gistle is the grant of benefits, which they run smack into Skyline with this court, which is very problematic for them, and they know it. They know it. Isn't it your burden to show that Red Rock would have taken the same actions at the same time, even if there had been no union activity? Where's the evidence of that? Well, we presented tons of evidence regarding the legitimate business reasons, which the judge discredited. I'm sorry? The timing, I think, is critical. The timing of the announcement? The timing of everything that happened, the announcement. Also, there's statements to employees about the benefits, that they could be taken away if you don't know the stakes, all of that. It just seemed that everything was geared towards the unionization efforts. And again, geared towards the unionization efforts is very different from geared towards interfering with employees' rights. What's the difference there? The difference is, if you're trying to stop the employees from voting for unionization, which affects their rights, I don't see what the difference is. Right. There's a difference because Red Rock was not trying to stop employees from voting. Red Rock was trying to encourage employees to not vote for the unit, and that's the difference. There is nothing wrong— You're not allowed to do that. You're not allowed to interfere with the union's voting for the union or not by doing things that are unfair labor practices. That is correct. But it is not unlawful to encourage employees to not want a union. That's what employers do in union campaigns all of the time. So, assuming we disagree with you, let's talk about the remedy. Sure. Sure. And that's really the heart of this case, right? So, getting beyond motive, which, if you look at the violations that were based on the speech, the threats, the promises, things like that, all of that is speech. There was no direct threats. They were all implied threats, and they were based on speech. And when you factor in— So, you think that this case turns on whether they're direct versus implied threats? I think that the Gissel bargaining order depends heavily on the nature of the violations found. And the problem with the board's case and the problem that the board has had all along is that nobody was fired. Nobody was told that this place is going to close down if a union comes in. There are ways to retaliate besides being fired. That's true. That's true. And there's three instances in the record that seem to be supported by evidence. But should we be considering this under Gissel or CEMEX? I don't know if I'm pronouncing that correctly. I believe it's CEMEX. CEMEX, okay. But let me first, if you don't mind, let me address those three allegations you're talking about. None of those—I assume you're talking about the warnings, the written warnings, and then after the election, there was a failure to recall a single person. No, there was somebody who was, I guess, penalized for putting too much horseradish in the potato salad. Correct, correct. Prior to— Somebody who was on disability but was made to clean drains that was not appropriate for her and then there was somebody who was not hired back even though she had seniority. So there were instances of retaliation. Right. Prior to the union's majority support, right? So when you look at whether— Oh, Teresa Powers, that was after the vote. Correct. Teresa Powers was after the election, six months after the election. So that was factored in as it relates to whether the— No, but it's just like what you said was not accurate. What I said was nobody was discharged, right? There was— We're past discharge. We were talking about other instances of retaliation, and you said none of this happened before the petition. None of this happened during the critical period. So after the petition was filed up until the election, so from that period. Also, from the October 16, 2019 period, when the union had majority status, from that period up until the election, there was not a single 8A3 violation, which is the discrimination allegation that you're referring to, okay? The reason it's important for this case, the reason it's critical— There are other violations, like the stakes, et cetera. Correct. But the reason this is all critical— You're trying to parse this very finely. And it's important to parse it finely because the Gissell bargaining order is an extreme remedy. This court has specifically held it's an extreme remedy, right? So if there's no extreme— Is your bottom line that this was not egregious? What's your bottom line on the Gissell bargaining remedy? The bottom line is that this court has said a grant of benefits is not a Hallmark violation. The board's entire case is grounded in that. But we have so much more than that. There's just so much more than that. There's a grant of benefits. There's the timing. There's the retaliation. There's the threats that you're going to lose all this. There's the stakes that say vote no. There's so much more than that. None of that is considered a Hallmark violation. I'm suggesting that without the so-called Hallmark violation, no accumulation of other violations can be sufficient to advance a clean election and acquire a Gissell order, a bargaining order? There are circumstances where violations and other violations beside a grant of benefits can support a Gissell, and this court has found that. However, this court, if you look at its jurisprudence on Gissell, has not enforced a single order that did not involve a discharge and that did not involve threats of closure, two of the most egregious Hallmark violations. And in fact, even in the Skyline case itself, while they were constrained to agree that the grant of benefits was unlawful under exchange sparks, they said this doesn't even come close to supporting a Gissell bargaining order, the extreme remedy. Let's talk a little bit about the miscellaneous unfair labor practices, because you've got a few of those that you're judging as well. Even if we were to rule in favor of you, and this again goes back to Judge Pan's question about how you're parsing things, if we ruled in favor of you on any of those, does it really change the outcome? Well, if you rule in favor of us on all of them, of course. I mean, in other words, there's still direct evidence in the record, as I indicated earlier in one of my initial questions. How does us ruling for those in your favor help you? Would it change the outcome if we still believe there's substantial evidence to support the board's decision? Well, if you rule, regardless of whether you rule in favor of us on any of the 881 violations, which is all that's in place here during that critical period, this is speech. These are statements, most of them by managers and supervisors who were in good faith trying to explain the processes. There was no intentional act here. There was nothing except for the unlawful motive found with the benefits, none of the other statements. What is your thought about what is acceptable for an employer to do? Maybe let's start there. What are you giving us as kind of the baseline for what an employer is allowed to do that does not taint or interfere with an employee's free choice as to whether or not to join a union? Communicate about the pros and cons, right, of unionization, have discussions. 8C protects that, right? That's the First Amendment. But in that communication, can you be derogatory toward the union? You can absolutely be derogatory towards a union. You cannot infringe on employees' rights. You cannot threaten, interrogate. You can't make those types of statements. And I think just going back, and I see I'm almost out of time if I can finish this talk. If you look at the context here, if you look at everything that was going on, the number of people involved, right? The heart of all of this is that employees' free choice to decide whether they wanted a union or not is best protected by the union organizers had employees sign. And that's what GISSL is all about. That is the reason, in this case, why it's not supportive of a GISSL, because these were not hallmark violations. This court has held as much. Okay. And then with respect to the structural argument, there's an allegation that you didn't preserve that. So you want to speak to that? Yes. So the unconstitutional aspects of the board, that came to light down the road after this case was in place. But that, in our position, is that that goes to the heart of the board to act. So that's not a question or an issue that can be waived. And so we argued it and respectfully request the court to consider. Okay. But you agree that you have not put it before the board or the ALJ? We did not raise it. That is correct. Yes. Okay. Your argument seems, insofar as you're talking about the necessity, or at least the near necessity of a hallmark violation, that seems to depend upon your characterization of Theresa Power's failure not being recalled as being something less than being discharged. That is, my position on that is based on the fact that that incident occurred six months after the election. And certainly after the point where employee's free choice was, you know, submitted to be expressed. And before or after the board had determined that the election was not valid? It was before the board determined the election was not valid. It was six months after the election. And the board looked at it and said, well, this means the employer, 1,300 employees, one single person not recalled, found to be through Union Animus. But regardless, there's nothing else to suggest a continuing effort or attempt to violate employee's rights. Suppose that it was for Union Animus, as the board found. And what is your answer to that? Why is that not your hallmark violation? It's not a hallmark violation that destroyed the laboratory conditions. It's not a hallmark violation. Hallmarks, you're saying? I'm sorry? There are hallmarks and there are hallmarks. Well, there are all fair labor practices that aren't hallmarks, but that might cumulatively be sufficient anyway. That's not what the board based its decision on. They can't rewrite their decision now through an argument. I don't think the word hallmark appears in their decision. I'm sorry? I don't think the word hallmark appears in the decision. Yes, it does. Does anyone accept our own decision? Yes, it does, Your Honor. In this case? It absolutely does. The board very expressly says the grant of benefits, in particular, is a hallmark violation. Okay. But you're saying that it's not? I mean, pardon me, that it's not a violation on these facts? I'm saying the D.C. Circuit says it's not. Well, you mean Skyline. Correct. Yeah, well, all right. We've got three pages from the board distinguishing that. We can talk about it further, but I don't think we need to. Anything else? Okay, thank you. Thank you, Freda. You may proceed. May it please the court, Kimberly Weber for petitioner, local joint executive board, also intervener for respondent. Today, I will refer to the party as the union, and I would like to reserve three minutes of my time for rebuttal. So the casino's violations in this case were profound. There was a monumental grant of benefits, followed directly by threats that the union properties would lose all of those benefits and not be able to gain them through bargaining. The board correctly found that these violations were deliberate and prolific. Overcoming the harm that the casino inflicted will take substantial effort. The union asks the court to enforce the order and to remand the case to the board to consider additional remedies, as argued in the union's opening brief. The union recognizes that the labor board has broad discretion with respect to remedies, and if the court were to question the union about what is more important, it is affirming the order because without the core remedies, the additional remedies would mean little. So are you suggesting that without the union access remedy, there's no way to repair the relationship with Red Rock? That is our argument because of the deep and substantial harm that was inflicted between, by the messaging between the union and the employees. The union access will help, as I say, the core remedies in the board's current order are the more important remedies. But the NLRB knows more about this than we do. If they thought that certain remedies were appropriate, who are we to say, no, we need more? I understand the standard of review for remedies. But it is the union's argument that if we look at board law, as argued in our brief, if you look at board law and look at the facts of this case, that those additional remedies are justified under board law and should have been awarded here. I don't hear you arguing very hard for what you said in your brief. I do believe that they are warranted. But as I say, the core of this case is the remedies that have already been awarded. The most important remedy that the union has requested is the right to reply. There was significant captive audience work in violations in this particular case. Had the union had the right to reply, it would have made a huge difference and perhaps we would not be here today. Sweber, how long elapsed from the election until the decision, board's decision? The, until the board's decision, you know, so the election was held on December 19th and 20th of 2019. The board's decision was June 17th, 2020. And do you have, is there in the record any information on the turnover among the employees? During that period? There has been turnover in, among the employees that is not in the record. It's not on the record? No. So the union's possession? I, there is currently a lot, a another separate labor board charge regarding recalls after the pandemic. It's on the record in that? Yes, yes. But it was, it is the change of the composition of the unit was not a issue that was raised by the petitioner Red Rock in this case. And it's not in this record. Okay, thank you. Thank you. Do union access remedies always have to accompany a bargaining order where the board finds the conduct severe and pervasive? No, they have not always accompanied a bargaining order. Thank you. Good morning. May it please the court. Eric Weitz on behalf of the National Labor Relations Board. I'd like to start just addressing the unfair labor practices briefly. I think we can largely rest on the board's brief and the decision in this case. But just to go to the grant of benefits, which I'd emphasize is really a constellation of dozens of violations, which was the announcement and promise of benefit, the subsequent threats that these benefits could go away and the related threats that if the employees voted for a union and tried to engage in collective bargaining, that that would be futile. So, the board looked at all of these together and found that this is really a textbook example of an employer who knows that the union has a majority support and is likely to win an election and thus calls out all the stops to coerce them and to prevent them from doing so. In terms of the timing, I would just, you know, our brief goes into the evidence in greater detail, which others courts look at. But just to highlight some key pieces of evidence, Joint Appendix 725 is an email from August 2019 where the employer's senior managers are sharing their gloomy assessment that the has significant majority support and is almost certain to win an election. That is before the new manager was brought in with the specific task of instilling a new anti-union campaign and when all of this benefits discussion started. So, this is not a situation where the employer was doing this for legitimate business reasons. All of this occurred in response to the ongoing union organizing at Red Rock in particular and Stations Casino Properties more broadly. Once the process was underway, there is a mountain of evidence that the specific intent of these benefits, the way they were designed, the way they were modeled on union proposals and union contracts and other facilities, and the timing of the announcement were to kill the union drive and to dissuade employees from voting for the union. And to go to your earlier question, Judge Pan, that is a violation of the Act to grant benefits to dissuade employees from unionizing. The Supreme Court upheld that in exchange parts. This Court has upheld that and there is more than sufficient evidence, more than substantial evidence in this case supporting the Board's decision. I will just briefly touch on Skyline and your question, Judge Ginsburg. The Board did here note that this grant of benefits can be a hallmark violation. That is not a necessary classification. We do not need to take a formalistic approach whether this was hallmark or not. The question is ultimately the facts of this case. And the facts of this case are very different from Skyline. Skyline was a situation where this Court did affirm the unfair labor practice finding, sort of begrudgingly. And factually, the Court found that that was a situation where the employer had independently decided to lift a wage freeze before it even knew union organizing was going on. And then there was no election petition pending. And when the employer announced that decision, which was made prior to the union, the Board found a violation. This is completely different given the factual record and the wealth of evidence of the employers on lawful motives and simply the scale of what was occurring here. This was a sweeping benefits package which completely overhauled all of the employees' benefits and was tailored to do so to coerce the employees from not voting for a union, both through promises of benefits and the related threats, which also are central to this case and were not in Skyline, where the promise of benefits was followed up by clear coercion throughout the bargaining unit that these benefits are going to be on the bargaining table and likely to go away if you vote for a union. Could we affirm under Giselle without reaching the CMEX issue? You could, Your Honor. But the Board would urge the Court to affirm both rationales. And the reason for that is, first of all, they're remedying different things. The inquiries are completely different, even though at the end of the day, you get to a bargaining order. So a CMEX bargaining order under the Board's new framework is essentially looking backward in time and saying, in December 2019, it's undisputed at this point that the union had majority support in the bargaining unit, or prior to December 2019 and all of the inferior practices. The union had majority support, as shown by cards. No one is disputing the validity of those cards. They were extensively litigated, and it is now conclusively shown that the union had valid majority support. They demanded recognition, as they are entitled to under Section 9A of the Act, and the employer refused voluntary recognition. So what the Board's new framework says is that the employer can insist on an election to test the majority status. Elections remain the preferred way of determining a union's majority. But if the employer then sabotages that initial timely opportunity to see in a fair and free election to confirm that these employees want a union, an employer should not be allowed to profit from that delay and should not be incentivized to engage in those kinds of unfair labor practices. So that is a violation that occurred and was complete as of the refusal to bargain and the interference with the election. But is it fair for us to apply the CEMEX standard to Red Rock when CEMEX wasn't in existence at the time that any of these events occurred? Because I guess CEMEX says that what the employer should do if they want to test the certificates is demand an election. But how is Red Rock supposed to know that that was the correct procedure when CEMEX hadn't been decided? Well, the reason it is fair, Your Honor, is to that question, there's two aspects of CEMEX, one of which isn't at issue here. So part of CEMEX, the Board said, when faced with a demand for recognition from a majority union, an employer now has an obligation to file its own election petition in a timely manner. That was overruling the Board's flint and lumber decision, which the Supreme Court affirmed as not arbitrary and capricious. So that rule is not at issue here because the union filed its own petition. But even if it's not at issue, it just seems a little unfair to impose a standard that they were not. I know that, like, Board law says things are retroactive, but it just seems to me that it seems a little unfair to say that, you know, we're going to impose this whole framework upon you that you never knew about at the time. I think if this had been a case where Red Rock was being faulted for not filing a petition, then there may be a stronger retroactivity argument there because they could say, you know, we were relying on lint and lumber. Lint and lumber said this is totally lawful for us to just wait for the union to file. That would be more of a retroactivity issue. The reason it's not unfair here is because the basis for the CEMEX bargaining order is that the union filed for an election, the election machinery was underway, and the employer then engaged willfully in dozens of violations of federal law. That's the basis for the CEMEX order here. And so it's a well-established- Regardless of how that election came about. The election came about and there was a- Right. And so this isn't a situation where an employer acted in good faith on what the law was at the time and is now being penalized for doing something that was lawful at the time. This is a situation where the CEMEX bargaining order is based on violations of federal law. And it's a well-established principle that in the retroactivity context that a respondent cannot claim, you know, I violated the law, but I only did so because I thought the remedies would be inadequate or there would be a different result at the end of the day, which is central to the board's reasoning in adopting the CEMEX framework, which is that under the pre-CEMEX sort of GISL framework, employers were incentivized to violate federal law, commit these unfair labor practices, because they get the benefit of delay. They then get a second bite at the apple first to get out of a GISL bargaining order, which is much more difficult to show and has become more difficult over time. And if they don't, if they avoid a GISL bargaining order, then they get a second bite at the re-run election years later, much to their advantage. And even if they get a GISL bargaining order, it's simply telling them to do what they were obligated to do years earlier when their employees chose to be represented by a union and presented proof of majority support, non-election proof of majority support. Is it fair to say that GISL allows unfair labor practices as long as they're not egregious? I mean, I wouldn't use the word egregious, but I would agree that it's much harder to establish the basis for a GISL bargaining order, because whereas CEMEX framework I was just discussing is looking backward in time, did the employer sabotage this timely initial election? GISL asks, and this is a policy choice made by the board during the GISL litigation, GISL holds a new election where the employees won't still be coerced. And that's why this court over many decades have imposed a series of requirements that the board needs to take into account, employee turnover, change circumstances, that it's more akin to an extraordinary remedy. This court has called it that at times. The board would not agree with that framing, but it's much harder to show that, you know, years later, we cannot have a new free election. And so the board has reviewed, you know, the board has experienced for decades the application of this framework and applying its expertise to the situation and CEMEX concluded that this framework simply is not working. It is not disincentivizing unfair labor practices, which allow for timely free elections, which is what, you know, we want under the act, and that we need to adopt this new framework because, if anything, the prior framework was incentivizing employers to engage in this kind of misconduct during election campaigns because they know that they can get away with it or have a good chance of getting away with it. And so CEMEX better effectuates employee free choice because in 2019— It takes away their ability to have a new election. Well, it does. That's the downside, right? Well, it does, Your Honor. So the board certainly is weighing those two factors, but this is something that the board has weighed and reached the same conclusion with Supreme Court approval going all the way back to the 40s. So I'd point the court particularly to the Franks Brothers case, the Lorillard case, and then Gissel, which— I understand that the board has broad discretion and expertise, et cetera, but it just seems to me that if the election would take place many years later, as in this case, it's not clear to me that you couldn't have a fair election. Like, there's an assumption. It's kind of like a strict liability standard that you're proposing. Well, it's not, Your Honor. The point of the CEMEX framework is just to ask a different question, which is that in 2019, it's undisputed that these employees in this bargaining unit wanted to be represented by a union. Under the Act, you know, a strict reading of Section 9A and Section 8A5 would say the employer immediately, in terms of sort of strict liability, has to bargain with that majority union. In CEMEX, the board is saying, we're not going to apply that kind of strict liability. We're going to allow an employer to say, I want an election to confirm this majority, but you only get one bite at the apple. If you then sabotage that initial election such that the board has to invalidate the then all you've done is refuse to bargain with the majority union, which is a violation of the Act. And the appropriate remedy, which is what Franks Brothers and Lorillard and Kissel reaffirm, is that you issue a bargaining order even if there's been changes. But it's just a bit harsh. And if, for example, there's one ULP during the election period, maybe it's not that bad of one because we've been discussing the range of ULPs that are available. And now there's an opportunity for an election five, eight years later because the board doesn't act very quickly sometimes. But your assumption is that we can't have a fair — it seems like the underlying assumption is you can't have a fair election. Well, two points to that, Your Honor. First, I'd just note in passing that, just to emphasize that a single ULP doesn't necessarily justify CEMEX bargaining orders, not a kind of strict liability like that. You still have to make a showing that the employer destroyed the laboratory conditions of the election. But assuming that is shown, which it is a lower threshold than a Kissel bargaining order, the board's reasoning is not that per se you cannot have a future election that's fair. The board is instead saying we don't need to look at whether another election is possible. A violation occurred of the employees who wanted a union in 2019. And the appropriate remedy, even though time has passed, the composition of the unit may have changed. The only way to avoid effectuating the original employee choice and preventing the employer from profiting from the delay is a bargaining order. That's what Frank Brothers says, so I would direct the court in particular to that case because the Supreme Court very clearly affirms the board's longstanding approach that, yes, some could say this is unfair to the employees now, but this is the only way to effectuate the policies of the act. And moreover, it's not an undue burden on the employees now, even if we assume, say, that the employees changed their minds and a majority now doesn't want a union. A bargaining order is not an undue burden because it's not a permanent relationship. This is only a temporary bargaining order for a reasonable period of time for the union to reestablish a foothold in the bargaining unit. And so after that reasonable period of time, if the employees don't want a union, then they can file a petition to decertify the union or to remove the union, and we can have an election that way. But the best way to effectuate the policies of the act is to say the employer violated the act when it initially refused to bargain with a majority union. That's a textbook violation of Section 9A and Section 8A5, and so we're going to order them to bargain despite the unfortunate delay that's unavoidable. And so that's the best way of effectuating employee choice in the board's reasonable view. And I see that I'm— That's all correct. Why should we—I mean, we have two alternative options here. Why should we address CEMEX? Right. So thank you, Your Honor. I was going to—I didn't get to that earlier. So the two reasons that we would urge the court to affirm under both rationales, first, is that they are addressing different things. There are distinct analyses. But secondly, just as a practical matter, there's certainly a likelihood in this case that the employer, for example, could seek further review of one or the other. And so if the court were to rest on just one rationale, which may be subject to further review, and say that were to then be reversed on further review, then it would simply delay this process even further, which the whole point here is to avoid— It seems that there wouldn't be further review, if you're talking about the Supreme Court, if we only rely on gazelle. Then it's not fact-bound. I mean, the employer could seek further review in this court, which is the Supreme Court, and so— And I don't think there would be further review if we relied just on gazelle. Whereas CEMEX is new, and maybe— Understood. I mean, I think it's difficult to say. So I just think there's a pragmatic reason that the board included both in its order, which is that, number one, they're remedying different violations, essentially, even though at the end of the day, it's a bargaining order. But it's also they're both necessary in this case to fully remedy the misconduct that  They're not fully—they're not both necessary, because if we uphold the bargaining order under gazelle, you've got a bargaining order. I take Your Honor's point that at the end of the day, the employer, in complying with the order, would be doing the same thing. But the board found different violations, issued different remedies. It's akin to, you know, if the board finds multiple Section 881 violations, typically the remedy for that is just a notice posting. In some sense, there's nothing else required with the floor, but— So additional remedy that hinges on CEMEX that doesn't rely also on gazelle, is there? Is that what you're trying to say? Yes. Well, they're independent. So even— Well, there are two rationales for a single remedy, which is the bargaining order. Or am I missing something? Well, I guess that's correct, Your Honor. But there are two violations that, at the end of the day, the employer has to do the same thing under both. So you're totally right that— Seems it would be superfluous to reach CEMEX. Well, I think it's not for the reasons I'm describing. I understand Your Honor's skepticism of the practical considerations. I guess the bottom line is the remedy. And if we uphold the remedy under gazelle, you get nothing more or less if we address CEMEX. I don't see why we would do that. We would be on more secure footing in the opinion that the court issues to shield against further review or other eventualities. So that's the only benefit? And I think to fully enforce and affirm the board's decision. But I agree, as a practical matter, if the court wanted to avoid one, it would not be fully affirming the board's rationale and decision, but the employer would be required to do the same thing either way. I think if the board wants to roll the dice on CEMEX, it's going to have to issue a decision based entirely on CEMEX. I don't think any court of appeals is going to accept your suggestion. Well, I take it Your Honor. Completely inconsistent with ordinary practice. And I want to offer you the opportunity to answer the question that I gave to your friend on the other side about where is the line drawn with respect to what employers can do without interfering and coming to an unfair labor practice? With in general, Your Honor? Yeah, just in general. And you can use these as examples about where you think it really pushed it because obviously they don't agree that this was the case. Sure. Well, I guess it depends on the particular type of... Is there anything employers can do to discourage union activity lawfully? Well, absolutely, Your Honor. Section 8C of the Act, as in the statute, protects the free expression of viewpoints and opinions by the employer. So employers are certainly entitled to communicate to their employees. We're opposed to the union. Here are the reasons we think unions would not be beneficial, et cetera. But there's many ways to cross a line. An employer needs to be careful that it doesn't fall over that line, as the Supreme Court said in Gissel. And so certainly you cross that line, for example, in this case, where you go beyond rhetoric and actually engage in threats or coercion, interrogation. Or here, we go far beyond rhetoric because it's the actual promise and subsequent follow-through and grant of a sweeping benefits package. So I think I would direct the court to Gissel as an explanation of, you know, Section 8C does protect employer speech. Are you relying highly on statements specifically and then also the timing and the execution? Yes. So in this case, there were a bunch of violations. And so you have numerous instances of promises of benefits before the election, threats that those benefits, the promise would be taken away. And then when the employer actually followed through and rewarded the employees for voting against the union, that's also a distinct violation of the Act. And then finally, the miscellaneous ULPs, how does that fit into here with respect to anything that we need to do with those? Which violations in particular, Your Honor? Or just the ones that they're raising? Like, do we need to adjudicate those to find that there is substantial evidence to support them or not? Or is the order the way? Well, yes, we would ask the court to affirm all the findings because there are distinct remedies, even for the more minor violations, which might even just be a line in the notice posting. So there would be a remedial notice if the court enforces the portion. There's a back pay issue here for Powers. Excuse me, Your Honor? There's a back pay issue for Powers. Yes, there's a back pay issue for Ms. Powers. There's also a back pay issue. There's an uncontested violation where after the election, the employer unilaterally cancels the table swap agreement, which is a way that some servers could make extra money. So there's may co-relief for that. And there's just additional remedies for each of these violations. So our position before the court is that substantial evidence supports all of the board's findings. And so the court should enforce the board's order in full as written. And I see I'm well over time, so unless the court has any further questions, I would note if there's any questions about agency deference, it was covered in the briefing, and I'm happy to discuss. But otherwise, we would just rest on the brief and ask for enforcement in full. Thank you. Thank you.  Thank you. And then back to present the union's case as an intervener at this time. Section 8C of the Act gives employers substantial leeway to campaign against a union. But there is a limitation in Section 8C, and that is that the expression cannot contain any threat of reprisal or force or promise of benefits. That is the line that the casino clearly crossed in this case. Much of the casino's challenges in this case are covered, as the court has already suggested, by the substantial evidence review standard. The board found that the casino did know of the union organizing campaign. The board found that the casino designed its benefits campaign to undermine union support, not for legitimate business reasons. The board found that the casino did make threats through its managers and its supervisors. And I could go on and on. Most of that is covered. With regards to the bargaining orders, it is the union's position that in this case, this promise or grant of benefits is a hallmark violation. The union has said before in its briefing that it believes that the exact timing of the grant of benefits and pinning that down is a distraction. The decision itself was made at a time and unannounced. And so the employees did not know. The harm to employees occurs when they find out about the grant of benefits. That occurred after the petition was filed. While GISSL is sufficient in this case, CEMEX is a return to a prior framework that will have great implications for the union in its organizing at station casinos and against this casino in the future. Thank you. Okay. The case is submitted. I'm sorry. We have one minute. I'm sorry. Thank you. I forgot about that. Briefly, Your Honors, I would encourage you to read carefully this circuit's prior decisions regarding GISSL. I would encourage this court to read and if you're so inclined to listen to the actual statements that were made by some of these supervisors and managers in context, not just accept the board's characterization and hyperbole of it. GISSL is much more than just the substance of the violations. GISSL also looks at can a fair election be had, right? Can it be had? It's been almost six years. There's been a 10-J in place. There's been no unfair labor practice findings. There's been notice posting. There's been notice reading. The expense of requests. Record on that here. I'm sorry? It's not on our record. It's... We have your representation on the board's questioning of it. That's all. The 10-J record, what's happened under the injunction is not in the record. It's connected to this case. It's referenced throughout. Because it arises from it, but it's not in this case. Okay, but it's referenced in the board's decision and the AOJ's decision. And the board is a party to it. That there is a 10-J, whether you've complied fully with it is not unquestioned. Well, we would submit that you can take judicial notice, certainly of the compliance that was done in that case through the affidavit submitted in that court. What was Red Rock supposed to do here? What were they supposed to do with ongoing union activity? What does any employer in an industry and in an area like Las Vegas that's heavily unionized and people wear union buttons and union shirts? You can let them unionize. You can let them unionize, but does the law require you to do that? No. The law doesn't require you to do that. And so... It seemed to me that Red Rock was just not aware of what the law required, or else it would not have been so overtly anti-union. There are better ways to do. Right. To accomplish what it was trying to accomplish. And I will end this, unless you have further questions with this, it's not unlawful to be anti-union. And that's the board's case, right? That's what they're saying. It's unlawful to interfere with, restrain or coerce employees. And so I think if that is kept in mind, I think... That's why I asked the question on the other side about what can you do to challenge it? Right. And they said that it was fine, from a free speech standpoint, to say what's bad about a union or why you would not want to join. Right. Right. And many years ago, before the amendments, there was no such protection. Employers could not speak. And the law developed to such a point where employers said, hey, we have First Amendment rights, right? We have free speech rights. So it was changed. It was codified to incorporate the First Amendment. So that is a defining line here. It's not unlawful to be anti-union. It's unlawful to interfere with, restrain or coerce employees. Thank you for your time. All right. Now the case is submitted.
judges: Childs; Pan; Ginsburg